ESTELLE and WILLIAM GOLDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Goldman v. Commissioner
Docket No. 6448-72.
United States Tax Court
T.C. Memo 1975-138; 1975 Tax Ct. Memo LEXIS 232; 34 T.C.M. (CCH) 639; T.C.M. (RIA) 750138; May 12, 1975, Filed *232 William Goldman, pro se. Curtis W. Berner, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1970 in the amount of $4,608.01. The issues for decision are: (1) Whether an amount of $20,000 which petitioner William Goldman received in consideration for a release of all claims against a corporation by whom he had been previously employed under an employment contract which had several years to run at the time of the release is taxable to petitioners as ordinary income or capital gain. (2) Whether petitioners are entitled to a capital loss because William Goldman did not receive the full amount of salary for the entire term of his employment contract. (3) Whether petitioners are entitled to deduct as business expenses all or any part of the amounts claimed to be deductible business expenses on a Schedule C, "Profit (or Loss) from Business or Profession," filed with their returns. FINDINGS OF FACT. Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in East Meadow, New York *233 at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1970 with the North Atlantic Service Center, Andover, Massachusetts. William Goldman (hereinafter referred to as petitioner) became employed by Canrad Precision Industries, Inc. (Canrad) in 1963. He received a salary and was separately paid for two patents which he developed while in their employ, being paid for one in 1968 and the other in 1969. Prior to August 29, 1969, petitioner had no written contract of employment with Canrad. On August 29, 1969, petitioner and Canrad entered into a contract which provided in part as follows: 1. Employment: The Corporation hereby employs the Employee, and the Employee agrees to render services to the Corporation, as Director of Chemical Laboratories. The Employee's powers and duties in that capacity are to be such as may be determined from time to time by the President and/or the Board of Directors of the Corporation. During the term of this Agreement, the Employee shall also serve without additional compensation in such offices of the Corporation as to which he may be elected or appointed by the Board of Directors *234 or the President. The term of employment shall be for a period of five (5) years, commencing September 1, 1969. The Employee shall not be directed to perform services on a regular basis at any point which is beyond a radius of fifty (50) miles from the City of New York. The Employee hereby promises to perform and discharge well and faithfully the duties which may be assigned to him from time to time in connection with the conduct of its business. 2. Compensation: (a) The compensation to be paid to the Employee by the Corporation shall be the sum of $18,000.00 per annum, payable in equal monthly installments on the last day of each month. (b) The compensation to be paid by the corporation to the employee shall increase by five per cent (5%) of the amount set forth in (a) above, on each anniversary date of the commencement of his employment hereunder, to wit, September 1, 1970, 1971, 1972 and 1973. * * * * *
3. Extent of Services: The Employee shall devote his entire time, attention and energies to the business of the Corporation and shall not, during the term of this Agreement, be engaged in any other business activities, whether or not such business activities *235 are pursued for gain, profit or other pecuniary advantage, provided, however, that the Corporation will not unreasonably refuse to permit the Employee, upon request, to engage in professional activities which do not materially interfere with the performance of his duties hereunder; but this shall not be construed as preventing the Employee from investing his personal assets in businesses which do not require any services on his part in the operation of the affairs of the company in which such investments are made and in which his participation is solely that of an investor. * * * 4. Disclosure of Information: The Employee recognizes and acknowledges that the Corporation's trade secrets and private processes, as they may exist from time to time, are valuable, special and unique assets of the Corporation's business, access to and knowledge of which are essential to the performance of the Employee's duties hereunder. The Employee will not, during or after the term of his employment, in whole or in part, disclose such secrets or processes to any person, firm, corporation, association or other entity for any reason or purpose whatsoever (provided that the Employee has reason to *236 believe that such is a trade secret); nor shall the Employee make use of any such property for his own purposes or for the benefit of any person, firm, corporation or other entity (except the Corporation) under any circumstances during or after the term of his employment, provided that these restrictions shall not apply to such secrets and processes which are then in the public domain (provided that the Employee was not responsible, directly or indirectly, for permitting such secrets or processes to enter the public domain without the Corporation's consent). 5. Inventions or Discoveries: The Employee hereby sells, transfers and assigns to the Corporation or to any person or entity designated by the Corporation all of the entire right, title and interest of the Employee in and to all inventions, ideas, disclosures and improvements, whether patented or unpatented, and copyrightable material made or conceived by the Employee, solely or jointly, during the term hereof which relate to designs, products, processes or devices sold, leased, used or under consideration or development by the Corporation or which otherwise relate or pertain to the business, functions or operations of *237 the Corporation. The Employee agrees to communicate promptly and to disclose to the Corporation in such form as he may be required to do so all information, details and data pertaining to the aforementioned inventions, ideas, disclosures and improvements and to execute and deliver to the Corporation such formal transfers and assignments and such other papers and documents as may be required of the Employee to permit the Corporation or any person or entity designated by the Corporation to file and prosecute the patent applications, and, as to copyrightable material, to obtain copyrights thereof. On September 30, 1970, petitioner terminated his employment contract with Canrad, sending Canrad the following letter of resignation: I hereby tender my resignation, effective immediately, and request that Canrad release me from my employment agreement dated August 29, 1969. I hereby agree to execute a general release in connection herewith and acknowledge hereby the receipt of $20,000.00 in satisfaction to all claims whatsoever between myself and Canrad. I agree to make myself available to Canrad as a Consultant when requested to do so, at a fee of $100.00 per day, or any part thereof *238 plus reasonable expenses. On October 19, 1970, petitioner received $20,000 from Canrad in consideration of his execution of a general release of all claims from Canrad, which release stated as follows: WILLIAM A. GOLDMAN for and in consideration of the sum of Twenty Thousand and 00/100 dollars ($20,000.00) lawful money of the United States of America to me in hand paid by CANRAD PRECISION INDUSTRIES, INC. the receipt whereof is hereby acknowledged, have remised, released, and forever discharged and by these presents do for my heirs, executors, and administrators and assigns, remise, release and forever discharge the said CANRAD PRECISION INDUSTRIES, INC. heirs, executors, administrators, successors and assigns of and from all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, in admiralty, or in equity, which against it, I ever had, now have or which my heirs, executors, or administrators, hereafter can, shall or may have for, upon or by reason *239 of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents. Petitioner received a letter dated September 30, 1970, from a New York law firm which was marked as being with reference to the Retro-Flective Assembly and Method of Making the Same, which was one of the patents which petitioner had, prior to 1970, assigned to Canrad for payment received from Canrad. The body of this letter stated: Listed below is status report of foreign applications and patents which have issued to date: Canada
Patent No. 840,843
May 5, 1970
France
No. 1,573,586
Patent Copy
not yet
received
Germany
Pending
Great Britain
Pending (Notice of Acceptance
Published August 12,
1970)
Italy
Pending
Should you require any additional information, please advise. Under date of October 19, 1970, petitioner addressed a memorandum to A. P. Boltri, in regard to "U.S. Patent Application, 770,682," which read as follows: This is for consulting services as follows: Consultation with Mr. Moscovitz of Blum, Moscovitz, Friedman & Kaplan on October 9; Composing affidavit for above patent on October 12, and Consultation *240 again with Mr. Moscovitz on October 13. The above consulting work plus expenses comes to a total of two (2) days at $100 a day: Total - $200. Petitioner's memorandum of October 19, 1970 to A. P. Boltri dealt with work petitioner did for Canrad in composing an affidavit for a patent application. After leaving Canrad, petitioner had printed a card which stated underneath his name, "New Product Development Chemical Consultant." In the upper right-hand corner of the card was the word, "Patents." In the lower left-hand corner were the words "Plastic-Films Coatings," and petitioner's address was in the lower right-hand corner. During 1970 petitioner called on persons engaged in various forms of businesses or employees of corporations engaged in businesses, offering to do work for them as a consultant. In 1971 he continued to call on such persons but neither in 1970 nor in 1971 did he receive any employment from any of these individuals for consultant work. Petitioners on their joint Federal income tax return for the calendar year 1970 reported the $20,000 received from Canrad in consideration for petitioner's release of claims against Canrad as long-term capital gain with the following *241 explanation: "Contracts Containing Patents, formulas and Tech. Know-how." Under date acquired, petitioner stated 1963-1968 and under date sold, Oct. 1970. Nothing was shown under cost or other basis. Petitioner's return included a Schedule C, "Profit (or Loss) from Business or Profession," on which he listed his principal business activity as consultant and the product, "Services Chemistry." Under gross receipts or gross sales petitioner wrote the word, "None," and under gross profit, the word, "None." Under other business deductions he listed the following: 11.
Depreciation
$857.00
14.
Repairs
250.00
16.
Insurance
116.25
22.
Bad debts arising from
sales or services
200
23.
Depletion
24.80
24.
Other business expenses
135.00
Total
$1,583 [sic]
Loss
($1,583.05)
Under Schedule C-1. "Explanation of Lines 6, 12, 14, and 24," the following appeared: Line No.
Explanation
Amount
16
Auto Insurance (1/3)
$116.25
14
Repairs to home office
250.00
24
Telephone
135.00
24
Gas and Electric
24.80
24
Car Expenses
200.00
11
Car Depreciation
857.00
Under Schedule C-2. "Explanation of Deduction for Depreciation *242 Claimed on Line 11," petitioner showed auto acquired in 1970 at a cost of $2,600 with no depreciation allowed or allowable in previous years and a useful life of 3 years with depreciation for this year of $857. On September 27, 1971, petitioner filed a Form 1040X "Amended U.S. Individual Income Tax Return," claiming an overpayment of income tax for the calendar year 1970 and under explanation of changes stated the following: Capital gains & Losses - Schedule D - Loss - due to sale of Company Contract, containing total rights to patents, formulae & technical data, thereby transferring these rights to the Company. The Contract covered a period of 5 years, with payments as follows: $18,000 - Aug. 1969 to Aug. 1970
18,900 - Aug. 1970 to Aug. 1971
19,845 - Aug. 1971 to Aug. 1972
20,817 - Aug. 1972 to Aug. 1973
21,857 - Aug. 1973 to Aug. 1974
$99,419
42,050
From the inception of the Contract
($57,369)
the Company paid me $42,050. (e.g.)
(Entered as)
Aug. 1969 - $18,900 - to
(a loss on)
Oct. 1969 - 3,150
(Schedule D)
1970 - 20,000 - Cash payment
(attached)
(Lump sum)
$42,050
See Contract excerpts attached. Respondent in his notice of deficiency, *243 mailed to petitioner on July 21, 1972, determined that the $20,000 received by petitioner in 1970 in consideration for the release signed by petitioner was taxable as ordinary income rather than long-term capital gain and increased petitioner's income as reported by the difference in the income resulting from reporting the $20,000 as capital gain rather than as ordinary income. Respondent disallowed all of the $1,583.05 business loss claimed by petitioner, stating that petitioner had not shown that the amounts of expenses composing this loss represented ordinary and necessary business expenses or were expended for the purpose designated. Petitioners in their petition stated that the entire deficiency as determined by respondent was in issue and that they claimed an overpayment of tax on capital losses totaling $57,369. OPINION It is a well settled principle of law "that consideration received for the transfer of a contract right to receive income for the performance of personal services, is taxable as ordinary income." , affd. *244 (C.A. 5, 1974), and cases there cited. Therefore, if we conclude, as a matter of fact, that the $20,000 which petitioner received in consideration of his release of all claims against Canrad was received for the transfer of his contractual right to receive income for personal services, the $20,000 is properly taxable as ordinary income as determined by respondent. Under the facts which we have set out, in our view the $20,000 was received by petitioner in consideration of release of his contractual rights to be paid for personal services. We have set forth in detail the agreement in petitioner's contract. This contract provides that petitioner "sells, transfers and assigns to the Corporation * * * all inventions, ideas, disclosures and improvements, whether patented or unpatented," made by him during the term of his contract with Canrad. The evidence shows that petitioner had prior to 1970 sold to Canrad the only two patents which the record indicates had been issued to him prior to 1970 and had been paid for those patents in 1968 and 1969. The employment contract further provided that petitioner agreed to disclose to the corporation any improvement *245 on these inventions and to execute and deliver to the corporation such formal transfers and assignments as might be required to permit the corporation to file and prosecute patent applications. If the record were not clear that petitioner had been paid prior to the year 1970 for the only two patents to which any reference is made in the record, there might be some question whether any part of the amount provided to be paid to petitioner as compensation under the employment contract should in fact be allocated to the purchase of his patents which existed at the time the contract was entered. However, the record here is clear that petitioner had sold to Canrad the two patents issued in his name prior to 1970, before the employment contract was entered into. It is also clear from the contract that petitioner's employment was to deal with improvements to patents which Canrad had previously acquired from petitioner, or, in other words, that petitioner was employed by Canrad "to invent." As we stated in , where a person is employed "to invent, *246 " the invention belongs to his employer and the payments to the employee are for his labor and not for the product. In , citing the Chilton case, we concluded, based on a contract which contained provisions in many respects substantially similar to those contained in the contract between petitioner and Canrad, that payment received by the taxpayer during the year from the corporation with which he had the contract was taxable as ordinary income. The payments involved in the Downs case were comparable to the salary payments of $18,000 a year plus the yearly 5 percent increases which petitioner would have received from Canrad had he remained in its employ. When petitioner released his claims against Canrad, insofar as this record shows his only claim against Canrad was for the payments required by his contract with Canrad of August 29, 1969. Therefore, the payment he received for the release is taxable in the same manner as would be the payments he would have received under the contract had the contract not been terminated. Under the facts here present, we sustain respondent's treatment *247 of the $20,000 received by petitioner as ordinary income. Petitioner's claim for overpayment based on a computed loss because he did not receive the total amount of payments under his contract with Canrad which he would have received had the contract remained in force for the full 5 years rather than being terminated, is in substance a claim of a loss arising because of unpaid salary. It is well settled that the term "loss" does not include a failure to realize anticipated income. (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. A failure to receive anticipated income provided for under a contractual arrangement does not result in a loss deductible in determining taxable income. . In , we pointed out that unpaid wages, salary, rent, and similar items which have never been reported as income by a taxpayer are not a proper basis for claiming either a loss or a bad debt deduction. We therefore hold *248 that petitioner is not entitled to a loss deduction in any amount in connection with the termination of his contract with Canrad. In our view, petitioner has failed to show that during the latter part of 1970, he was engaged in business as a consultant and has also failed to show substantiation of any of the expenses he claims to be deductible as business expenses. Carrying on a business requires a showing of more than seeking to be retained as a consultant by several firms. There is no showing that petitioner ever received any income from his claimed business as a consultant. There is no indication whether or not petitioner received the $200 for which he submitted a memorandum to an employee of Canrad. Even if he did, an isolated transaction for a former employer based on 2 days' work is not sufficient to indicate that petitioner was engaged in the trade or business of being a consultant. . Even if petitioner had established the expenditure of some of the items that he claimed to be business expenses and that these expenses were incurred in calling on businesses in an effort to obtain consultant business *249 or were connected with such activity, which on this record he has not, the expenses would still be in respect to investigation of opportunities to enter into or form a potential business and would not qualify as deductible business expenses. . We therefore hold, on the basis of the record, that petitioner is not entitled to the claimed $1,583.05 business loss and sustain respondent's disallowance of this claimed loss. Decision will be entered for respondent.